### HIDALGO COUNTY WATER CONTROL & IMPROVEMENT DIST. NO. 1 v. GANNAWAY. (No. 8073.)

Court of Civil Appeals of Texas. San Antonio. Dec. 22, 1928.

Rehearing Denied Jan. 23, 1929.

Don A. Bliss, of San Antonio, and Neal A. Brown, of Edinburg, for plaintiff in error.

Cameron & Epperson and J. F. Carl, all of Edinburg, for defendant in error.

SMITH, J. The Hidalgo County Water Control and Improvement District No. 1 is a public subdivision operated under the provisions of chapter 25, p. 86, General Laws 39th Leg. 1925, incorporated into Complete Tex. St. 1928 as chapter 3A, title 128. The district was originally organized and operated as Hidalgo County Water Improvement District No. 4, but was converted into the present name and corporation under the provisions of article 7880—143, Complete Tex. St. 1928. The district embraces about 40,000 acres of land, of which about 25,000 acres are being actively irrigated from the district system, which is traversed and supplied by about 175 miles of canals and laterals. D. C. Gannaway owns and operates a farm within the territorial bounds of the district. The district is the plaintiff in error in this appeal, but for convenience will be referred to as the district, or as appellant; while Gannaway, the defendant in error, will be referred to as plaintiff, or as appellee.

Appellee brought this action against the district to recover $42,000 damages alleged to have been sustained by him on account of the failure of the district to comply with its alleged contractual obligation to furnish him water at an agreed time with which to irrigate 57,300 seedling citrus plants in March, 1925.

It is a matter worthy of judicial notice that the soils of Hidalgo and adjacent counties are peculiarly adaptable to the production of citrus fruits, and that such has become an important industry of that section. The propagation of citrus fruit trees is by a familiar process. Seeds are planted in hotbeds, and sprout into seedlings. After they have attained sufficient stability, the seedlings are pulled from the hotbeds and transplanted in rows, where in due course they grow into maturity. In the Rio Grande Valley the seedlings are usually transplanted in the spring. In the late summer or early fall they are subjected to the process of budding, or grafting, and by the ensuing spring or summer they reach the status of nursery stock. The seedlings have a market value of $25 to $35 per thousand, and the orchard stock a market value of $1 to $1.50 per tree.

In the late winter of 1925 appellee, Gannaway, had a large supply of seedling orange

trees in his hotbeds, which he intended to transplant for the purpose of growing an orchard of his own. He prepared his land to receive these seedlings, and on March 11, filed an application with the water district for water with which to irrigate the seedlings as soon as transplanted; the product being of such nature as to require irrigation promptly after transplantation. This application was in proper form, and was accompanied by the proper charge for the service applied for, thereby entitling appellee to that service. These facts are conceded by appellant. Appellee's application took the usual course in the operation of the district, passed through the hands of 'the district manager and water superintendent, who passed it on to the ditch tender in whose section of the district appellee's lands were situated. A head of water was turned into the lateral leading to appellee's land, and this head of water was tendered to appellee late in the afternoon of March 11, for delivery during the night, but appellee rejected it, because none of his seedlings had been transplanted to receive the water. As a consequence, it became necessary to pass this head of water to the applicant next entitled to receive it. In this situation, according to the trial court's findings, the ditch tender stated to appellee that another head of water was en route to appellee's laterals, and would reach appellee's premises, for appellee's use. at noon the next day, the 12th, and in reliance upon that statement of the ditch tender appellee proceeded with a ·large force on the following morning to begin the transplantation of his seedlings, and continued the process through the 12th, 13th, and 14th, completing the transplantation at noon of the latter date. No water was furnished, however, until about 4 o'clock on the afternoon of the 15th, and, as a result of the delay, 50,000 of appellee's 57,000 plants died during the ensuing two months, when it was too late for appellee to secure other seedlings with which to replace those lost. Appellee sued appellant for the damages he sustained on account of this loss, and recovered the conjectural market value of the 50,000 lost seedlings had they lived and thrived until the spring or summer of 1926, less the expense of their preservation. nurture, cultivation, and budding.

Appellee contends, and the court found, that the statement or promise of the ditch tender constituted a contract binding the district to furnish an irrigation of water to appellee at noon, March 12, and held the district liable as for the breach of contract, in failing to furnish the water at that time. Appellee also contended, and the court found, that the certain statements and promises made prior to March 11 by A. Ledbetter, one of appellant's five directors, concerning the furnishing of water to appellee in the future, were binding upon the district. Out of these contentions and holdings arises the question of whether or not the officials and agents of the district have power to bind the district by contracts made by them in the matter of the administration in detail of the affairs of the district, including agreements to furnish water to land owners for irrigation purposes at a particular time in the future.

■■ Appellant district is the creature of the statutes, to which, under familiar rules, we must look for the purposes of the corporation and the powers and duties of its governing board, which are restricted to those prescribed in the creating acts. In those acts it is expressly stipulated that the board of directors of the district "shall make all contracts pertaining" to "all the affairs of such district." Article 7652.

■ It is true that it is further provided in article 7772 that the manager elected by the board of directors shall have power "to execute on behalf of the district all water contracts and other contracts that are not required by the law to be executed by the board or by the president and secretary for the board," but this power is limited to the ministerial act of signing contracts actually authorized and made by the board. and does not authorize the manager to originate or make contracts binding upon the district. That authority by express terms of the statute is lodged exclusively in the board of directors, acting as a body, which "shall make all contracts pertaining" to "all the affairs of such district." Even the power of the board of trustees to make contracts with water users is restricted by the statute to agreements specifying the acreage to be watered, the crops to be planted, the amount of the charge therefor, and the terms of payment of that charge, for it is provided in article 7752, that "the board of directors may, at their discretion, require every person desiring water during the course of the year to enter into a contract with the district, which contract shall indicate the acreage to be watered, the crops to be planted, and the amount to become due, and the terms of payment; and it may be further required that the water taker shall execute a negotiable note or notes for such amounts, or for parts thereof." These restrictions evidence but a rational control over water improvement districts by the Legislature, which created those districts. It is reasonable that the boards of directors of such districts, as well as their officials and agents, should be denied the power to make special or peculiar contracts with particular water users, all of whom are entitled to uniform privileges and benefits from the district, without discrimination against, or preference in favor of, any one of them. The sole object of the district is to supply water for the irrigation of the irrigable lands within the bounds of the district. The water of the district system should be equably and uniformly distributed to those lands under reasonable rules and regulations and upon legal

applications and payment of appropriate and uniformly applied charges. And this constitutes the whole duty of the district. In order to properly perform this duty, the water must be distributed or tendered to each applicant in his turn, with due regard, however, to the nature and necessities of the crops to be watered, and any contract to supply water to a particular taker at a particular time in the future would be beyond the scope of authority of any one other than the board of directors, and beyond their authority as well, if its performance would work a discrimination, or a preference in favor of one taker over another.

■ It is conceded that appellee made legal application for the water required by him for his purposes, and paid the requisite charge therefor. Appellant had sufficient water and facilities under its control to supply appellee's demand. In this situation it became appellant's duty to supply the water to appellee at the earliest time consistent with its obligation to the other consumers of the district and with its established rules and regulations for the equable and uniform distribution of water. If it failed in this duty, it became liable in damages to appellee for all the injury he sustained as the natural consequence of that failure.

This measure of appellant's duty and liability arises from the law, and not from contract, except such as arose by implication from its duty as fixed by the law. No official or agent of appellant had or could acquire authority to make any contract in behalf of appellant to restrict or enlarge that liability, and such contract, if made, would be void and unenforceable, and its breach could not form the basis of a suit for damages.

■ This court held in the case of Holderbaum v. Hidalgo County Water Improvement District No. 2, 297 S. W. 865, that a district of this character is not of such public nature as to entitle it to exemption from liability for the torts or negligence of its agents in carrying out the objects of the corporation. In so holding in that case the court, or at least this writer, was somewhat in doubt about the correctness of the conclusion, in view of the declarations in section 59, art. 16, of the state Constitution, and article 7731 of the Statutes of 1925. In the cited case this court gave its reasons for the conclusion stated, but did not, in the opinion finally handed down and published, express the doubt or discuss the considerations giving rise thereto, to wit, the constitutional and statutory declarations concerning the status of water improvement and control districts. As the question is again raised in this appeal, we are constrained to give it some notice.

The statutes providing for the establishment, organization, and operation of water improvement districts were enacted in pursuance of a constitutional amendment adopted by the people of Texas in the year 1917,

now constituting article 16, § 59, of the Constitution. It is declared in this provision that irrigation and related public improvements are "public rights and duties," and that the districts therein authorized "shall be governmental agencies and bodies politic and corporate with such powers of government and with the authority to exercise such rights, privileges and functions concerning the subject matter of this amendment as may be conferred by law. * * *" The last-quoted provision is brought forward into article 7731, R. S. 1925.

The inquiry has arisen in the mind of the writer as to the purpose of these constitutional declarations, which are so unusual as to warrant the conclusion that they were intended to signify a particular and specific purpose. It is obvious that, under the common law, irrigation corporations, whether public or private, are not "governmental agencies," exercising "public rights" and performing "public duties" in the sense those terms are usually employed in ascertaining the liability of such corporations. Such agencies, when exercising such rights and performing such duties, are declared by the common law, as construed by the courts of this and other states, to be free of liability for the negligence or torts of their agents in the performance of official duties, unless such liability is provided for by express statute. Was it intended in those declarations by the framers of the constitutional provision to lift such corporations, therein authorized, from the status universally occupied by purely local public organizations, and give them the preferred status of municipalities exercising "public rights" and performing "public duties," with all the exemptions accorded such municipalities by the common law? If this was not the purpose of those declarations, then none other is conceivable, and they have no effectual significance. It seems to the writer that the constitutional declarations must have been made in view of the inhibition against exemption from the common-law liability and of the decisions of our Supreme Court giving effect to the common-law rule applicable to municipalities exercising functions other than those essentially public in character, and were intended to protect the districts therein provided for against the operation of that rule.

But, to prolong this discussion, entered into in deference to the argument of counsel for appellant, is unprofitable, for we have concluded that to give the proposed construction to the constitutional and statutory declarations would be to bring those declarations into conflict with a well-established public policy, as well as with other constitutional provisions. For to permit the agents of any municipality in the performance of official duties to willfully or carelessly trespass upon and destroy or seriously impair private property in the operation of a public work, and yet

deny compensation to the owner, or to disregard lawfully assumed obligations to the citizen, and yet deprive him of any recourse, would contravene express provisions of our own Bill of Rights, as well as familiar provisions of both the federal and state Constitutions. As the declarations under consideration do not clearly express such an abhorrent purpose, we will not construe them to intend that effect.

■ We have had much difficulty in reaching a conclusion as to a just and proper measure of damages in the case. The trial court measured appellee's damages by the difference between the market value of the plants saved by appellee and the probable market value of the remainder had they survived, thrived, and reached the status of nursery stock a year after they were transplanted, less the probable expense of their care, cultivation, budding, and marketing. Approximately 50,000 plants died within a few weeks after transplantation. The trial court estimated their value, had they survived and reached the status nursery stock, at $1 each, or $50,000, from which he deducted $15,995 probable expense and a probable natural loss of 5 per cent. of the crop, and rendered judgment in favor of appellee for the balance, $34,005.

The trial court applied the measure of damages applicable to the destruction of growing annual crops, such as cotton, corn, vegetables, as exemplified in the early case of International & G. N. R. Co. v. Pape, 73 Tex. 503, 11 S. W. 526. Under the general rule in cases of destruction or injury to growing fruit trees, which are held to be a part of the realty to which they are attached, the destruction of the tree is regarded as an injury to the realty for which an action will lie. But even in those cases the remedy is diversified, for, if it appears that the trees would have a value when detached from the realty, the owner may recover both for the value of the trees at the time destroyed and for injury to the realty. Galveston, H. & S. A. R. Co. v. Warnecke, 43 Tex. Civ. App. 83, 95 S. W. 600, and authorities there cited. This distinction and diversity of remedy rest upon the basic fact that the process of destroying the trees carries with it some definite physical injury to the land, such as the burning of grass, seepage, and the like, and consequent injury to the turf or sod. Growing fruit trees such as cannot be transplanted and have no value when detached from the soil bear the same relation to the land as turf or sod, and their destruction gives rise to a suit for injury to the realty. Galveston, H. & S. A. R. Co. v. Warnecke, supra.

But the case made here is not brought within that character of action, for it is undisputed that the seedlings, when transplanted, grow into nursery stock, and when they reach that status may again be transplanted, without injury to the plants or to the soil, into other soil, and there grow into maturity.

Orchard stock in the Rio Grande Valley has a definite market value as such, and, having this aspect, the case is taken out of the category of suits for injury to realty. If the trees destroyed in this case had passed the stage permitting their transplantation, it is probable that the resulting cause of action would have been for damages for injury to the realty, which would be measured by the difference between the market value of the land immediately before and immediately after the injury.

There appears to be no case in the Texas reports directly in point with this case. The Warnecke Case, supra, concerned the destruction of mature perennial fruit trees, whereas the trees destroyed in this case were seedlings which, had they not been destroyed, would have passed through the status of nursery stock, with a definite market value as such, before they reached the status of mature fruit trees. Because of this peculiarity, it would seem clear from the authorities that they must be regarded in the light of a growing annual crop, bringing them within the rule applied in the Pape Case and the many cases following it, wherein the measure of damages is the difference between the market value of the trees themselves immediately before and immediately after the injury, without the element of injury to the land itself. And in determining the damages in such case the jury may take into consideration the probable value of the trees had they grown into maturity as nursery stock, the next definite stage they would have reached in the process of ultimate maturity.

Appellant contends that in the application of this measure the jury or court is required to enter the field of conjecture and find damages that are too remote and speculative and uncertain to constitute a just and lawful measure of liability. It is contended that the processes through which a citrus fruit tree passes from the stage of a delicate seedling to maturity as nursery stock, running the gauntlet of transplantation, watering, cultivation, budding, and seasonal changes and caprices, are too uncertain to warrant a just and legal recovery for a definite sum in damages. It is true, of course, that this process is attended by an element of conjecture and uncertainty. But no better method of ascertainment is suggested by experience, none is apparent in reason, and none is afforded in the books. Accordingly, we are obliged to sustain the rule applied in the trial court. Kinney Irr. and Water Rights (2d Ed.) § 1698; Farnham, Waters and Water Rights; Sabine & E. T. Ry. Co. v. Johnson, 65 Tex. 389; Galveston, H. & S. A. R. Co. v. Warnecke, supra. A contrary rule seems to be approved, "in cases of contract, at least" in Sabine & E. T. Ry. Co. v. Joachimi, 58 Tex. 456.

We have reached the conclusion that the duty of appellant in this case was of a public nature; that no authorized express contract

209

was made in its behalf to furnish water to appellee at any particular time, but that under the facts of the case it fully met its primary obligation to appellee when it tendered and he rejected a head of water on the night of March 11, whereupon it became the duty of appellant to deliver to appellee the next head of water available to him under the published rules and regulations of the district, with which appellee was familiar, and which are concededly reasonable in purpose and effect. If it did so, it is not liable to appellee; if it did not, then in our opinion it is liable for the damages resulting to appellee as a natural consequence of the failure. In order that the cause may be tried upon that theory, the judgment will be reversed and the cause remanded.